Kit James Gardner (161736)
**LAW OFFICES OF KIT J. GARDNER**
501 West Broadway, Suite 800
San Diego, CA  92101
Telephone: (619) 525-9900
Facsimile:   (619) 374-2241

Proposed General Counsel for Debtor-in-Possession
CrediautoUSA Financial Company LLC

Martin A. Eliopulos (149299)
Paul J. Leeds (214309)
**HIGGS FLETCHER & MACK**
401 West A Street, Suite 2600
San Diego, CA  92101
Telephone: (619) 236-1551
Facsimile:   (619) 696-1410

Proposed General Bankruptcy Counsel for Debtor-in-Possession
AI CAUSA LLC

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>CrediautoUSA Financial Company LLC,<br><br>        Debtor. | CASE NO. 19-01870-CL11<br><br>*(Joint Administration Request Pending)*<br><br>CHAPTER 11<br><br>**MASTER DECLARATION OF RAFAEL GOMEZ AND EXHIBITS IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS FOR:**<br><br>**1) AUTHORIZATION TO USE CASH COLLATERAL; AND**<br><br>**2) AUTHORIZATION TO PAY INSIDER COMPENSATION** |
| In re<br><br>  In re AI CAUSA LLC,<br>  (Case No. 19-01864-LA11)<br><br>        Debtor. | |

*///*

1    I, Rafael Gomez, declare as follows:

2    1.    I am over the age of eighteen and am the President and Chief Executive Officer

3    of CrediautoUSA Financial Company LLC, the Debtor-in-Possession in the above-captioned

4    case ("Crediauto"), which is the sole owner and Manager of the jointly administered Debtor-in-

5    Possession AI CAUSA LLC (collectively, the "Debtors").  I have personal knowledge of the facts

6    set forth in this Declaration, except those facts stated on information and belief, which I believe

7    to be true.  If called as a witness in this matter, I could and would testify competently to the facts

8    set forth herein.

9    **A.    Crediauto's Business**

10    2.    Crediauto has been in business since 2013 as an automobile lender.  Crediauto

11    has established business relationships with car dealers in Southern California, Southern

12    Nevada, and Southeast Texas, and enjoys good reputation as a lender who serves minority

13    communities.  Among other things, Crediauto uses proprietary software that automatically

14    makes decisions on applications by borrowers according to certain criteria and parameters of

15    the software.  Use of this software has reduced delinquencies, as has utilization of an in-house

16    collections team.

17    3.    Crediauto's current troubles are therefore **not** the result of delinquencies in its

18    underlying loan portfolio, or the result of missed payments to its financial backers.  Rather, its

19    troubles are the sole result of heavy-handed and unjustified maneuvers undertaken recently by

20    its new lender, Arena Investors, LP ("Arena").

21    **B.    Crediauto's Financial Arrangement with Arena and the Creation of CAUSA**

22    4.    Crediauto's relationship with Arena began early last year on or about March 20,

23    2018, when the parties entered into an arrangement for a credit facility for up to $20 million.

24    The credit arrangement is a convoluted one which involved the creation of AI CAUSA, LLC

25    (which is an amalgam of the names "Arena Investors" and "Crediauto USA") (hereafter referred

26    to as "CAUSA"), which also filed a bankruptcy petition on the same date as Crediauto.

27    5.    CAUSA is wholly owned and solely managed by Crediauto.  CAUSA was created

28    at Arena's direction and insistence for the purpose of "purchasing" Crediauto's preexisting loan

1   portfolio and "purchasing" additional auto loans originated by Crediauto.  CAUSA has no

2   business operations, and performs no function other than to hold Crediauto's loan portfolio.

3   Arena and its Lending Agent possess a putative security interest in CAUSA's loan porftfolio.

4   Thus, in my opinion, CAUSA is simply an intermediary between Crediauto and Arena, and the

5   "transfer" of Crediauto's loan portfolio was merely a transfer for security.

6          6.     Arena also created an entity, AI CA LLC (the "Lending Agent"), to serve as an

7   agent for Arena.  On or about March 21, 2018, CAUSA initiated a "borrowing request" to the

8   Lending Agent for $3,393,228 (in actuality initiated by Crediauto as sole member of

9   CAUSA).  I am informed and believe that on or shortly after that date, Arena capitalized the

10  Lending Agent with $3,393,228.  The Lending Agent then loaned CAUSA $3,393,228, which in

11  turn used it to "pay" Crediauto $3,393,228 to "purchase" Crediauto's entire loan portfolio which,

12  at the time, had a principal balance of approximately $6,095,416.

13         7.     As the "seller" of the loan portfolio, Crediauto ostensibly became nothing more

14  than a "servicer" of the portfolio, tracking and accounting for payments made on account of the

15  underlying auto loans, and repossessing cars when necessary.  Crediauto also became the

16  guarantor of CAUSA's obligations to Arena / the Lending Agent.

17         8.     However, I do not believe that the "sale" by Crediauto to CAUSA was a true sale,

18  since Crediauto continued to manage the loan portfolio and originate new loans for the portfolio,

19  and never even received the full value of the loan portfolio that it transferred.  Specifically, as

20  already mentioned, the portfolio had a principal balance of $6,095,466 in March of 2018 when it

21  was transferred, so Crediauto received only approximately 54% of the portfolio's value.

22  Therefore, in reality, and despite the transaction's seeming complexity, I believe that nothing

23  more than an ordinary credit arrangement was created, which was secured by Crediauto's loan

24  portfolio.[1]

25  _____

26         [1]  Section 2.03 of the Receivables Purchase Agreement even takes into account the eventuality
    that the sales were not true sales, providing in relevant part that,

27         In the event that . . . the transfer and assignment contemplated hereby is held not to be a sale,

28                                                                                          (continued...)

**C.      The Alleged Defaults of Crediauto and/or CAUSA**

9.      Pre-petition, the Lending Agent sought to foreclose on the entire portfolio, citing imaginary and non-existent defaults.  For example, the Lending Agent cited a failure by CAUSA to make the interest payments due under the loan documents.  However, according to Crediauto's records, not only have the payments been made, but I am informed and believe that Arena's Lending Agent is the one that deducted the payments from CAUSA's account.[2]  Thus, Crediauto and CAUSA are in compliance with the repayment requirements and the borrowing base requirements.

10.      Nonetheless, the Lending Agent accelerated the approximately $3.4 million due to it (and added approximately $100,000 in unexplained additional amounts), and cut-off Crediauto's and CAUSA's access to their *own bank accounts* by virtue of the Lending Agent's control over those accounts.  The Lending Agent has not even allowed Crediauto to be paid its minimal monthly contractual "serving fee" for continuing to service, preserve, and maintain the loan portfolio.

11.      In accelerating the loan and taking the drastic steps that it has, the Lending Agent made a vague contention that Crediauto—as the servicer of CAUSA's loan portfolio— failed to use the income stream generated by the loans in the manner purportedly required by the loan documents.  It is a mystery, though, why Arena and its Lending Agent would care how CAUSA and Crediauto use the income generated by the loan portfolio *so long as payments to Arena are current and/or Arena is not rendered insecure by a reduction in the borrowing base*. That gives me cause for concern that Arena is engaging in a wrongful loan-to-own strategy.

_____

(continued...)

the Seller hereby (a) grants to the Purchaser a security interest in the Property described in each Transfer Agreement, (b) agrees that this Purchase Agreement shall constitute a security agreement under applicable law . . . .

This alternative scenario purports to grant CAUSA a perfected security interest in the loan portfolio, thereby acknowledging that Crediauto continues to possess an ownership interest in the portfolio.

[2] All funds in CAUSA's "Collections Account" are regularly swept to the Lending Agent's account. The Lending Agent then deducts the interest due for the approximately $3.4 million loan, as well as other reimbursable amounts.

12.     By way of further background, after Crediauto transferred its loan portfolio to CAUSA, Crediauto was also expected to generate <u>new</u> loans for the portfolio.  The loan documents give CAUSA the right—*after* all payments due to Arena—to use the remaining funds generated by the portfolio's income stream to use for the acquisition of new auto loans for the portfolio.  Crediauto and CAUSA did, in fact, use the extra income to fund the acquisition of new loans.  It was this use of funds, and the meaning of what it takes to "acquire" a new loan, that caused Arena to accuse Crediauto and CAUSA of misusing funds, pursuant to which Arena's Lending Agent declared a default and accelerated its approximately $3.4 million loan.

13.     Perhaps typically, Arena has interpreted the meaning of "acquisition" of new loans in its narrowest sense to exclude any direct cost and expenses, as well as overhead costs that might be incurred in "acquiring" a new loan.  Crediauto interpreted it to include overhead. Crediauto's interpretation is more accurate and sensible, since: (1) Crediauto and CAUSA were in compliance with all payment obligations under the loan documents, and (2) there is no realistic way that Crediauto could have acquired new loans without incurring overhead expenses (such as advertising and dealer incentives, to name a few).

14.     Moreover, Crediauto's "servicing fee" of no more than approximately $20,000 per month[3] was: (a) for servicing loans, not acquiring them, and (b) plainly inadequate for Crediauto's ongoing operations and loan acquisitions.  Indeed, in my opinion, $20,000 per month would barely employ only one manager and perhaps two collection agents to minimally service the portfolio; it is certainly not sufficient to operate the business that the parties contemplated, *i.e.* a fully staffed and operational loan originator that could grow the portfolio for the benefit of Arena and the Debtors.

///

---

[3] Calculated at a rate of 4% of the value of the loan portfolio, divided by 12.  Thus, assuming that the portfolio in any given month had a value of $6 million, Crediauto would be entitled to a monthly fee of $20,000 plus reimbursement for certain expenses mainly related to the sale or repossession of autos. See Servicing Agreement attached hereto as Exhibit "B", at ¶ 2.

15.     Due to the position it has taken, I am concerned that Arena may be pursuing a "loan to own" strategy.  Arena's Lending Agent scheduled a foreclosure sale to take place on April 1, 2019, pursuant to which the Lending Agent sought to foreclose on the entire loan portfolio which, as of March 28, 2019, had a face value of approximately $4,671,793, as well as foreclose on approximately $400,000 in funds on deposit in Crediauto's and CAUSA's bank accounts, *and* foreclose on virtually all of Crediauto's other personal property, including valuable and proprietary Intellectual Property—all to satisfy a debt which the Lending Agent alleges is only $3,498,057.

16.     Moreover, for the last 4 months, the Lending Agent has denied Crediauto and CAUSA access to their own bank accounts by virtue of certain "control agreements".  Arena and the Lending agent have therefore attempted to starve Crediauto and CAUSA of the funds that they need in order to service and maintain the loan portfolio and originate new loans.

17.     Efforts to informally resolve the impasse with Arena have failed.  At one time, Arena proposed a workout solution which would have entitled it to all of the above *plus* property belonging to Crediauto in which Arena does not possess a security interest.

**D.     The Debtors' Proposed Future Operations and Plan**

18.     Before entering into its financial arrangement with Arena on or about March 20, 2018, Crediauto benefited from a lending program which compensated dealers on favorable terms, allowing Crediauto to grow a portfolio which, as of March of 2018, had a face value of approximately $6,095,466.  Upon entering into its arrangement with Arena on or about March 20, 2018, though, Arena insisted on a different manner of conducting business that presumably lowered the risk profile of the loan portfolio.  However, the new business model did not appear to have reduced the risk profile appreciably, and worse, it resulted in a significant drop in loan originations.  Specifically, Crediauto was able to originate only $325,650 since entering into the arrangement with Arena.  In comparison, between 2014 and 2016, Crediauto originated more than $20 million in loans without the restriction imposed by Arena.  Crediauto therefore intends to return as soon as practicable to its previous business model.

19.     The Debtors also presently intend to submit a Joint Plan of Reorganization that will, among other things, save the loan portfolio and other valuable assets from foreclosure for the benefit of all creditors by either: (1) curing and reinstating the loans from Arena / the Lending Agent, or (2) paying off Arena / the Lending Agent with post-petition "take-out" financing. Option one is viable because the Debtors were never in default of their payment obligations under the loan documents in the first place. Option two is also viable because the Debtors are in discussions with parties who are interested in partnering with Crediauto to ensure that it repays all of its debts and continues its successful lending program.

**E.     CAUSA's and Crediauto's Need for Funds**

20.     Approximately $205,000 in revenue is to be generated each month from CAUSA's loan portfolio. As explained *supra*, in Paragraph 5, CAUSA has no business operations, but was established solely to hold the promissory notes incident to the automobile loans originated by Crediauto. CAUSA therefore relies exclusively on Crediauto to service and maintain the loan portfolio and originate new loans for the portfolio as old loans mature, or become delinquent and go into repossession. Crediauto therefore needs to pay collection representatives, repossession agents, and other vendors to collect delinquencies, and also needs to pay loan originators to bring in new loans, as well as overhead expenses that are a necessary incident to its business. Crediauto's monthly expenses are set forth in the budget attached hereto as Appendix "A".

21.     As shown in Appendix "A" hereto, Crediauto's monthly expenses are projected to be no more than $90,000. As discussed *supra*, Arena and the Lending Agent accused the Debtors of breaching the Credit Agreement because the Debtors had used some of the revenue generated by the loan portfolio to pay the types of expenses set forth in Appendix "A". However, as discussed *supra*, in Paragraphs 12 through 15, I believe that the loan documents authorize the use of such funds, and that Arena's restrictive interpretation of the loan documents is unreasonable.

22.     At any rate, the amount of funds available on a monthly basis will be more than sufficient to continue paying Arena the contractually required interest payments. After payment

of the $90,000 proposed to be paid to the Debtors each month in Appendix "A", approximately $115,000 will remain to: (a) make the monthly interest payments to Arena / its Lending Agent in the amount of approximately $30,000, and (b) originate new automobile loans with the remaining approximately $85,000 monthly balance.

23.     With respect to originating new loans, the Debtors propose to follow the same lending program that has been in place since the Debtors entered into the lending arrangement with Arena on or about March 20, 2018, which is a "pooled" lending program obliging dealers to put all originated loans into pools of 50 loans, with very low payments to the dealers upfront, and sharing the risk and potential upside with the dealer in the long run as the clients pay.  However, because this program is in reality one that most dealers with whom Crediauto does business have rejected, the Debtors intend to return to the lending program they had in place before March 20, 2018 as soon as practicable.  That program sold easily because it did not require dealers to put loans into pools, gave them a higher payment upfront and the dealers did not have to share the risk of the portfolio.

24.     Alternatively, the Debtors would be willing to allow Arena to use the $85,000 monthly surplus to pay down its principal obligation to Arena instead of generating new loans. Either scenario provides Arena and its Lending Agent with ample adequate protection, in addition to the equity cushions discussed *supra*, in Paragraph 15 (specifically, the loan portfolio with a face value of approximately $4,671,793 as of March 28, 2019, plus approximately $400,000 in cash—all to satisfy a debt which the Lending Agent alleges is only $3,498,057).

F.     **The Debtors' Insider Compensation**

25.     Crediauto's central management consists of the individuals listed in the table below.  Each is critical to the ongoing operations of not only Crediauto, but the servicing, maintenance and growth of CAUSA's portfolio.  Each individual will be needed in order to successfully accomplish the goals of the Debtors' reorganization and implement the Debtors' reorganization plan.  The Debtors therefor propose paying each on a post-petition basis as follows:

///

| Name | Relationship to Debtor | Proposed Compensation | Payable |
|------|------------------------|----------------------|---------|
| Rafael Gomez | President & CEO; 26.1187% owner of Crediauto | $72,000/year | $6,000 once monthly |
| Carlos Betanzo | VP & General Counsel; 0.2167% owner of Crediauto | $60,000/year | $2,500 twice monthly |
| Manuel Fernandez | Chief Financial Officer 8.9025% owner of Crediauto | $48,000/year | $4,000 once monthly |
| Guillermo Velarde | Chief Compliance Officer & VP of Asset Recovery; 3.4777% owner of Crediauto | $48,000/year | $4,000 once monthly |
| Rick Haskell | Chief Operating Officer | $156,000/year | $6,500 twice monthly |
| Mirmahshad "Michael" Fattahi | Chief Technology Officer | $72,000/year | $3,000 twice monthly |

26.     As President and Chief Executive Officer, I lead all the areas of the company.  I have 24 years of experience in financial services and 6 years with the company.  I am in charge of the entire operation, relations with creditors and investors, sourcing investments and funding, as well as with car dealers, I am also in charge of sales and marketing, product development, supervision of all above officers, team building and motivation.

27.     Carlos Betanzo is the Vice-President and General Counsel.  Carlos is responsible for all legal affairs of the company, including but not limited to regulatory and licensing matters, drafting and reviewing contracts, HR related issues, all corporate matters and litigation.

28.     Manuel Fernandez is the Chief Financial Officer.  Manuel is in charge of budgeting, accounts payable, portfolio tracking and management, as well as supervision of the accounting department; in charge of reporting to creditors and of tracking accrual of interests and other payables.

29.     Guillermo Velarde is the Chief Compliance Officer and Vice-President of Asset Recovery.  Guillermo is in charge of establishing and compliance of policies and procedures, legal compliance matters, as well as heading the asset recovery department, in charge of ordering repossessions, liquidating inventory, and control and management of vehicle titles.

30.     Rick Haskell is responsible for all operations and credit risk management duties companywide. The COO is a leader of all departments, ensuring operations follow a consistent

1   and cohesive practice across the enterprise. Policies and procedures are to be well-

2   documented, and enforced throughout the organization. The COO / CRO assumes responsibility

3   for organizational growth, effectiveness and efficiency across all departments.

4        31.    Michael Fattahi is in charge of all company technology and technological

5   resources. The CTO establishes company technology vision, strategies, and plans for growth.

6   The CTO supervises system and quality assurance processes, and focuses on maintaining and

7   improving all technological issues in the company.

8        32.    Crediauto proposes compensating each person at the rates set forth

9   hereinabove, which—at least with respect to the four officer / owners, Mr. Gomez, Mr. Betanzo,

10  Mr. Fernandez and Mr. Velarde—is believed to be below average for the positions held within

11  the industry.  I believe that the rates proposed to be paid to Mr. Haskell and Mr. Fattahi are

12  within industry standards.

13       33.    The services to be rendered by these individuals are essential to both

14  Crediauto's business and the stability and maintenance of CAUSA's loan portfolio.  Technically,

15  they are employed by Crediauto but, as discussed *supra*, Crediauto is the exclusive servicer of

16  CAUSA's loan portfolio, which Crediauto "transferred" to CAUSA as a condition of gaining

17  access to the $20 million credit facility structured by Arena.

18       34.    In my opinion, the aforementioned individuals have expertise and knowledge of

19  Crediauto's history and business operations which are critical to the success of Crediauto's and

20  CAUSA's bankruptcy proceedings.  If the Court does not approve reasonable compensation for

21  them, Crediauto may be forced to retain new management who would require similar (if not

22  greater) compensation in any event and result in disruption to the reorganization process.

23  **H.**    **Relevant Documents**

24       35.    I am one of the custodians of records for Crediauto and CAUSA, and have

25  knowledge of their regularly conducted business practices, including their practices for

26  generating records and making and maintaining copies of records that are generated in the

27  ordinary course of their business.  Unless otherwise stated, all of the exhibits or copies of the

28  exhibits in this declaration have been maintained by Crediauto in the ordinary course of

Crediauto's regularly conducted business activities.  My knowledge as set forth in this Declaration is based in part on my knowledge and review of those documents.

36.    Attached as Exhibit "A" hereto is a true and correct copy of that certain Amended and Restated Credit Agreement by and among AI CAUSA LLC and CREDIAUTO Financial Company LLC (the "Credit Agreement").

37.    Attached as Exhibit "B" hereto is a true and correct copy of that certain Servicing Agreement.

38.    Attached as Exhibit "C" hereto is a true and correct copy of that certain Receivables Purchase Agreement.

39.    Attached as Exhibit "D" hereto is a true and correct copy of that certain Guaranty and Security Agreement.

40.    Attached as Exhibit "E" hereto is a true and correct copy of that certain Backup Servicing Agreement.

41.    Attached as Exhibit "F" hereto is a true and correct copy of that certain Vehicle Leinholder Nominee Agreement.

42.    Attached as Exhibit "G" hereto is a true and correct copy of that certain Warrant.

43.    Attached as Exhibit "H" hereto is a true and correct copy of certain Lender Default communications.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on the date set forth below at San Diego, California.


Dated:  April 3, 2019            /s/ Rafael Gomez                          .
                                 RAFAEL GOMEZ

## Appendix A

## CrediautoUSA Financial Company LLC
Estimated Monthly Budget

| ESTIMATED INCOME | |
|---|---|
| Principal | $99,853 |
| Interest | $105,118 |
| **Total** | **$204,970** |

| ESTIMATED EXPENSES | |
|---|---|
| Bank & Merchant Fees | $2,000 |
| Computer systems expenses | $7,500 |
| Credit Bureau Services | $800 |
| General and Administrative | $400 |
| Insurance | $1,000 |
| Lease Vehicle Expense | $540 |
| Legal and professional fees | $5,500 |
| Office Supplies | $500 |
| Payroll Processing Fee | $210 |
| Payroll Tax Expense 2019 | $3,017 |
| Rent Expense | $2,942 |
| Repossession Fees | $8,000 |
| Salaries and Benefits Expense | $45,475 |
| Sales Commissions | $800 |
| Telephone and internet expenses | $3,000 |
| Utilities | $450 |
| Sales and Marketing | $2,000 |
| Miscellaneous / Contingency Expenses | $5,000 |
| **Total** | **$89,134** |

| Balance | $115,836 |
|---|---|

| INTEREST TO ARENA | $31,708 |
|---|---|

| BALANCE | **$84,128** |
|---|---|

(to be used to generate new automobile loans
for the CAUSA loan portfolio)